**Charles W. GOODSON, Plaintiff,**

v.

**Otis R. BOWEN, Secretary, United States Department of Health and Human Services, Defendant.**

**No. C–C–85–111–M.**

United States District Court, W.D. North Carolina, Charlotte Division.

June 17, 1986.

Seth H. Langson, Connelly, Karro, Blane, Sellers & Langson, Charlotte, N.C., for plaintiff.

Charles E. Lyons, Asst. U.S. Atty., Charlotte, N.C., for defendant.

## ORDER

McMILLAN, District Judge.

Charles Goodson, the plaintiff, was born on December 22, 1944 (Tr. 50).

On February 17, 1983, he applied for disability insurance benefits and Supplemental Security Income (SSI) (Tr. 1, 66). After initial denials, a hearing was held before an Administrative Law Judge (ALJ) on March 9, 1984. In a decision dated March 27, 1984, the ALJ found that plaintiff was disabled due to his mental impairment. Benefits under disability insurance were denied, however, because plaintiff's alleged "onset date" for his disability was January 17, 1983, and he was last insured for disability insurance benefits on September 30, 1982. The ALJ did not consider whether in fact plaintiff had become disabled before the onset date that plaintiff put on his application.

Plaintiff petitioned the Appeals Council for review on April 10, 1984. On January 15, 1985, the Appeals Council affirmed the ALJ's decision.

On February 12, 1985, plaintiff filed this suit challenging the Secretary's final decision. On May 2, 1985, plaintiff moved for summary judgment. On January 17, 1986, the Secretary filed a motion for remand asserting that he "has agreed to remand this case to determine whether Plaintiff's disability began prior to his alleged onset date."

### Testimony at the Hearing

Plaintiff testified that he had a sixth grade education but that he could not read or write "too good at all." That is because he cannot see well and he cannot read well. (Tr. 33–34.)

He said that he had run a game room for awhile but "didn't make no success at it. I had a lot of trouble out of people cause I couldn't get along with people and they burnt me out." (Tr. 34.) He took in less than $50 a month. (Tr. 35.) The place was "burnt out" on January 17, 1983.

When asked why he couldn't get along with the people, he said: "Well I tried to tell'em I wanted'em to do what I wanted'em to do there, they just come in there and try to take over and try to tell me what to do. And I'd pick up a stick or something and knock'em in the head with it." (Tr. 36.) He said people would come in and "make fun of me and try to push me around and everything." "[T]hey all time say everybody knows I got ... mental condition and they all time picking on me down there. Everybody all time picking on me cause they know I'm easy to get mad. And they'll pick at me to get me mad and gets me in a lot of trouble. I don't bother nobody. I tend to my own business .. people just picks at me and makes me mad." (Tr. 37.)

Before running the game room, starting in May of 1983, he had run a concession stand, but had made nothing there either. People, he said, "talked me into giving'em stuff on credit and I give'em stuff on credit and they wouldn't pay me back. And I wind up ... I had to borrow money from my friends and relatives to pay my bills with. They broke in on me and robbed me

and took over $1,000 of my products." (Tr. 38.) He ran the stand for four months. Before that, he couldn't remember when, he had worked for the Singer Sewing Machine Company stacking wood. There,

"some boys got making ... making jokes at me ... making fun at me and I went ... my boss about it and he wouldn't do nothing about it. Me and my boss man got into it and I got mad at him and I put my hand through a car door window window dow on a car door. And he fired me for destroying company property. Cause I got mad on the job." (Tr. 40.)

The longest he had ever held a job was four months.

Plaintiff also testified that he had been heavily involved with drugs in the early seventies. He had overdosed on "acid," "yellow jackets," and "black beauties." (Tr. 41.)

As to how he relates to others, plaintiff said:

"I just feel like everybody is against me and nobody don't care nothing about me and everybody is trying to do everything they can against me. I see people ... if I'm around a crowd of people and I see'em standing off from me and looking at me and talking ... I get to feeling like their talking about me and it gets me ... mad and upset." (Tr. 42.)

Plaintiff had lived for awhile with his sister but she kicked him out "because there was three boys come there and going to kill me. I got paranoid and scared and I went in the closet and hid cause I didn't have no gun and I knows they was out to kill me. And I didn't know what for ...." (Tr. 44.) His sister got scared, he said, and kicked him out in the rain.

At the end of the hearing, plaintiff described his physical problems (tr. 47–48) and then stated:

"Plus that I got migraine headaches and paranoid mental problem. Doctor told me I had paranoid mental problem that showed up. And I've been in mental institution numbers of times, I don't know how many times I've been in

Broughton. And on top of all that I had a nervous breakdown in '74. I shot a man in New Jersey six times cause I was messed up on drugs. I ain't doing no drugs now, I'm trying to straightened up and do what's right. But now I got to have some help, I'm in bad shape." (Tr. 48.)

### The ALJ's Decision

The ALJ found that plaintiff was last insured for disability benefits on September 30, 1982. Because the plaintiff had alleged that he became disabled only as of January 17, 1983, the ALJ held that the plaintiff could not qualify for disability. The ALJ made no attempt to determine whether plaintiff's alleged disability onset date was correct. He considered himself bound by the onset date:

"As the claimant's alleged onset of disability occurred after the date he was last insured for disability insurance benefits, the claimant cannot be found entitled to disability insurance benefits as he failed to meet the disability insurance status requirements of the Act on January 17, 1983, the date he stated that he became unable to work." (Tr. 17.)

That did not end the analysis, however, because the plaintiff had also applied for Supplemental Security Income (SSI) benefits.

The ALJ proceeded to determine whether plaintiff qualified for SSI. In this analysis, the ALJ determined that as of January 17, 1983, the alleged onset date, plaintiff was mentally impaired. (Findings of Fact ## 8–12; Tr. 21.)

The ALJ summarized the medical evidence on this point as follows:

"The medical evidence shows that the claimant was hospitalized in Broughton Hospital in 1972. In 1976 he was treated at the Gaston County Mental Health Clinic for paranoid schizophrenia. In June 1981, a consultative psychiatrist noted that the claimant displayed paranoid ideation as a result of his poor interpersonal relationships, and that he had a marked restriction of daily activities and constriction of interests. The diagnosis was of a borderline personality disorder with paranoid traits. In February 1982, after an 18 month program of individual therapy and chemotherapy, Dr. George Nichols, a psychiatrist with the Gaston-Lincoln Area Mental Health Center, concluded that the claimant had an anti-social and paranoid personality disorder (Exhibits 36, 45 and 47 [tr. 172–80, 250–52 & 254]).

"On February 19, 1983, hospital emergency room physicians noted that the claimant appeared depressed. In March 1983, Dr. S.K. Willis, a consultative physician, also noted that the claimant was depressed (Exhibits 48 and 52 [tr. 255–62 & 271–83]). In February 1983, the claimant was examined at the Gaston-Lincoln Area Mental Health Program for complaints about being homicidal and suicidal. He was worried that somebody was trying to "bump him off". His girlfriend had left him and his business had recently burned down. He complained of difficulty sleeping, black out spells, and feeling shaky inside. He did not seem psychotic or paranoid and he appeared to have continuity of thought. The diagnoses were of an adjustment disorder with mixed emotional features and an anti-social personality disorder (Exhibit 50 [tr. 266–69]).

"In August 1983, the claimant underwent a psychological evaluation by Dr. John W. Long. The claimant's personal appearance was poor and he appeared rather lethargic but cooperative. He was essentially oriented but showed a poor memory, mild depression, poor judgment, and a blunted affect. Results of the WAIS–R showed his verbal IQ was 74, his performance IQ was 77, and his full scale IQ was 75, suggestive of borderline intellectual functioning. Although he appeared able to follow instructions and to perform simple, repetitive tasks, he showed a pattern of very low tolerance for frustration. Results of the Rorschach Test and the clinical interview showed his thinking was subject to

auditory hallucinations and paranoid ideation, and he showed a pattern of irritability and poor judgment in interactions with other people. He did not hesitate to act out in an aggressive manner and he tended to express anxiety through multiple somatic symptoms and depression. It was concluded that the claimant showed rather severe emotional problems characterized by low frustration tolerance and irritability, tendencies to act out aggressively, paranoia, depression and poor social judgment. The diagnoses were of an anti-social personality disorder and borderline intellectual functioning (Exhibit 63 [tr. 297–300]). In February 1984, a rehabilitation counselor with the State of North Carolina noted the claimant's long history of psychological problems and concluded that he could not justify rehabilitation services for the claimant due to the severity of his problems (Exhibit 64 [tr. 301])."

### Discussion

As an initial point, this case must, at the least, be remanded because the ALJ incorrectly considered himself bound by the plaintiff's onset date. The ALJ's conclusion was erroneous.

Social Security regulations describe when a period of disability begins as follows: "Your period of disability begins on the day your disability begins if you are insured for disability on that day." 20 C.F.R. § 404.321. This section does not say that the "disability" of a disabled claimant begins on the date chosen by the claimant as the onset date. Indeed, Social Security Ruling 83–20 shows that the alleged onset date is only one of the things to be considered in finding the actual onset date. The pertinent parts of that ruling read:

"Factors relevant to the determination of disability onset *include* the *individual's allegation*, the *work history*, and the *medical evidence*. These factors are often evaluated together to arrive at the onset date. However, *the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence*" (emphasis added).

\*    \*    \*    \*    \*    \*

"In determining the date of onset of disability, *the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence or record*" (emphasis added).

In most cases where the alleged onset date and the actual onset date are not the same, the actual onset date will probably be subsequent to the alleged onset date. In that situation, the Secretary is clearly not bound by the alleged onset date. *Cox v. Secretary*, 521 F.Supp. 1295, 1298 (E.D.Pa.1981). This court can see no reason that the rule should be different when the actual onset date is prior to the alleged onset date.

At the very least, therefore, because the ALJ found that plaintiff was mentally impaired as of January 17, 1983, this case would have to be remanded for consideration of a narrow question: whether the plaintiff's condition was the same on September 30, 1982, the last date of insurability, as it was on January 17, 1983, or whether his condition deteriorated from non-impairment to impairment in that interval.

It is, however, patently obvious from the ALJ's summation of the medical evidence and the medical exhibits on which that summation is based that plaintiff's condition was essentially the same on September 30, 1982, as it was on January 17, 1983. In that interval, his pool hall had been burned out and his girlfriend had left him. These events depressed him but there is no evidence that they made him mentally impaired when he had not previously been

mentally impaired. Indeed, the diagnosis as early as February, 1982, was that plaintiff had an anti-social and paranoid personality disorder. (Tr. 254.) The February, 1983, evaluation by the same doctor, though the notes accompanying it related the recent events, simply restated that diagnosis. (Tr. 267.) Furthermore, the August, 1983, evaluation by the consulting psychologist also reached the same conclusion. (Tr. 299.)

In fact this evidence shows that plaintiff, if he was mentally impaired on January 17, 1983, was mentally impaired as early as February, 1982, and probably as early as December, 1980.

 It is also obvious that plaintiff's two jobs between December, 1980, and January, 17, 1983, do not count as employment or trial employment (20 C.F.R. § 404.1592) because his income was less than $50 per month (see tr. 35 & 38–39).

Plaintiff was disabled on January 17, 1983; he was also disabled as of February, 1982. Therefore, the Secretary's decision that plaintiff does not qualify for disability benefits is not supported by substantial evidence.

### ORDER

IT IS THEREFORE ORDERED:

1. That the Secretary's second motion to remand (filed January 17, 1985) is DENIED;

2. That plaintiff's motion for summary judgment is ALLOWED; and

3. That the case is REMANDED to the Secretary for computation and payment of benefits.